**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CRISTA PEMBERTON, | |
| Plaintiffs, | No. 20cv4411 (EP) (AME) |
| v. | **OPINION** |
| PAUL PAPPAS, *et al.*, | |
| Defendants. | |

**PADIN**, **District Judge.**

Defendant Paul Pappas, a Township of Edison ("Edison") police officer, threatened and assaulted Plaintiff Crista Pemberton when they were in a relationship. After the relationship ended, Pappas stalked Plaintiff, culminating in Pappas tracking Plaintiff to a boyfriend's home with a GPS tracker and slashing her tires.

Plaintiff sued Pappas, who has defaulted, as well as Edison Chief of Police Thomas Bryan ("Chief Bryan"), Edison, and the Edison Department of Public Safety ("EPD"). Plaintiff alleges intentional torts against Pappas, and negligent hiring, supervision, and retention claims and 42 U.S.C. § 1983 claims against Defendants. Defendants move for summary judgment dismissing the claims against them.[1] For the reasons below, the Court will **GRANT** the motion *in part*.

---

[1] Plaintiff's Complaint names "EPD," but clarifies that Edison and EPD are "collectively referred to . . . as . . . EPD." Compl. at 1 n.1. To the extent, however, that local police departments, county jails, and other county agencies are not separate entities subject to suit under Section 1983 because they are merely administrative arms of the municipality or local government, EPD is not a proper party to this action. *See Mikhaeil v. Santos*, 646 F. App'x 158, 163 (3d Cir. 2016). Accordingly, the Court will *sua sponte* dismiss EPD on that basis. "Defendants" will therefore refer to Chief Bryan and Edison.

I.      BACKGROUND[2]

A.  The Parties

Edison is a public entity and Chief Bryan is a public employee as defined in N.J.S.A. 59:1-3.  D.E. 94-17 ("Defs. Facts") ¶ 1.  Plaintiff and Pappas had a multi-year personal relationship beginning in 2011—according to Plaintiff, a "rocky" one.  *Id.* ¶¶ 4-5; D.E. 94-7 ("Pl. Dep."[3]) at 43:8-18.  During that time, Pappas allegedly threatened and physically assaulted Plaintiff.  Defs. Facts ¶¶ 4-5; Pl. Dep. at 45:11-25.  On at least one of those occasions, he did so while he was on duty with EPD.  Pl. Dep. at 46:1-6.  Pappas lived in Plaintiff's home for approximately nine months through July 1, 2017.  Defs. Facts ¶ 7; D.E. 94-6 ("IA Interview"[4]) at 4:9-14.

B.  Plaintiff Speaks with Chief Bryan About Pappas

At some point before Pappas moved in with Plaintiff, Plaintiff had a conversation about Pappas with Chief Bryan at Bryan's office.  Defs. Facts ¶ 8; Pl. Dep. at 89:12-90:19.  According to Defendants, this was an "off the record conversation."  Defs. Facts ¶ 9; IA Interview at 6:21-7:5.[5]  According to Defendants, Plaintiff asked Chief Bryan to address Pappas's "behavior" and

---

[2] These facts derive primarily from Defendants' Statement of Material Facts, D.E. 94-17, and Plaintiff's supplemental facts, D.E. 95-5 ("Pl. Supp. Facts").  In response, Plaintiff lets Plaintiff's citations "speak for" themselves.  *See, e.g.* D.E. 95-4, Plaintiff's Response to [Defendants'] Statement of Material Facts ("Pl. Resp. Facts") ¶ 3 ("To the extent that Defendants are merely recounting Plaintiff's deposition testimony, Plaintiff agrees that her deposition speaks for itself.").  However, if a non-movant does not agree with a fact, it must "stat[e] each material fact in dispute and cit[e] to the affidavits and other documents submitted in connection with the motion."  L.Civ.R. 56.1(a).  Otherwise, "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."  *Id.*  Here, the Court deems any fact not *explicitly* disputed, with a citation explaining the basis for the dispute, to be undisputed.

[3] Plaintiff's Exhibit F, Plaintiff's December 27, 2021 deposition.

[4] Defendants' Exhibit E, Plaintiff's March 27, 2018 interview with EPD Internal Affairs ("IA").  Though Plaintiff notes throughout her Responsive Facts that the IA interview was unsworn, she affirmed at her subsequent deposition that she spoke truthfully with IA investigators.  Pl. Dep. at 84:19-85:22.

[5] At her deposition, Plaintiff said that she did "not know" whether it was "off the record."  Pl. Dep. at 64:2-9.

"talk to [Pappas] about backing off a little bit."  Defs. Facts ¶¶ 8, 9; Pl. Dep. at 89:12-90:19.[6] Plaintiff spoke directly to Chief Bryan because she "didn't want [Pappas] to lose his job."  IA Interview at 86:3-14.  Chief Bryan responded that he would "do his best."  Defs. Facts ¶ 10; IA Interview at 7:11-12.

Plaintiff disputes Defendants' characterization of that meeting.  According to Plaintiff, while she "did not know" whether she told Chief Bryan that Pappas had "shoved his gun in [her] face" or "knocked her teeth out," Pl. Dep. 60:15-18, she *did* inform Chief Bryan that she was "afraid," *id.* at 61:1-4.  At his deposition, Chief Bryan recalled Plaintiff asking, without explaining why, for Pappas to "stay away" from her.  *See* D.E. 94-10 ("Bryan Dep.") at 73:1-14.[7]

Chief Bryan spoke to Pappas and relayed Plaintiff's request.  Defs. Facts ¶ 12.  Pappas, showing Chief Bryan his recent cell phone communications, responded that it was, in fact, Plaintiff who contacted Pappas "incessantly."  *Id.*; Bryan Dep. 73:17-24.  Plaintiff later learned, via a call from Pappas's mother, that Chief Bryan did speak with Pappas about Plaintiff's concerns.  IA Interview at 7:18-8:4.  Thereafter, Plaintiff did not make any further complaints regarding Pappas to Chief Bryan or EPD's Internal Affairs Unit prior to the subject incident on March 19, 2018.  Pl. Dep. at 64:10-65:11.

### C.  The Stalking

After Pappas moved out of Plaintiff's home on July 1, 2017, they did not speak for three months.  Defs. Facts ¶ 19; IA Interview at 14:13-16.  Sometime in late 2017, they began

---

[6] Plaintiff argues that she does "not know" whether she wanted the conversations to be, or whether they actually were, "off the record."  Pl. Resp. Facts ¶ 9.
[7] Defendants' Exhibit I, Chief Bryan's August 24, 2022 deposition.

speaking again.  IA Interview at 15:2-16:6.  Their relationship was "friendly" with "no issues"; as far as Plaintiff knew, Pappas had resumed a relationship with his ex-wife.  *Id.*[8]

Early the following year, Plaintiff had come to believe that Pappas was stalking her.  Defs. Facts ¶ 23.  On Valentine's Day and St. Patrick's Day in 2018, Pappas sent Plaintiff flowers.  *Id.* ¶¶ 20-21.  On the evening of March 18, 2018, Plaintiff invited Pappas to her home, where he expressed feelings for her.  Defs. Facts ¶ 22; IA Interview at 34:1-35:18.  Plaintiff later testified that she invited Pappas out of fear that if she refused, he would kick her door in.  Pl. Dep. at 97:1-7.

March 19, 2018 was Plaintiff's dog's birthday; that day, Pappas dropped off a birthday card for the dog.  Defs. Facts ¶ 25.  Later that day, Plaintiff invited Pappas over to talk.  *Id.*  While Pappas was at Plaintiff's home, Plaintiff was preparing for a date with a new boyfriend.  *Id.* ¶ 26.  Later that evening, when Plaintiff was at her boyfriend's home in New Brunswick, they witnessed—and surveillance footage captured—Pappas searching under Plaintiff's car, then stabbing the sidewall of the car tire.  *Id.* ¶ 27.  They called the New Brunswick Police Department ("NBPD"), and Pappas was arrested later that night.  *Id.*  It was discovered that Pappas had purchased and used a GPS tracking device to follow Plaintiff.  *See* D.E. 94-13.

The next day, Pappas was suspended without pay as an EPD officer.[9]  Defs. Facts ¶ 28. Thereafter, Pappas was indicted for numerous offenses; he pled guilty on October 17, 2019 pursuant to a plea agreement which called for mandatory incarceration and forfeiture of any law

---

[8] This is an example of a "dispute" without elaboration or citation to the record."  *See* Pl. Resp. Facts ¶ 19.

[9] It is unclear, and the parties dispute, whether Pappas was actually terminated by EPD.  *Compare* Defs. Facts ¶ 28 (citing Plaintiff's acknowledgment at her deposition that Pappas "never worked again" as an EPD officer) *with* Pl. Resp. Facts ¶ 28 ("Plaintiff has not received any notice from Defendants that . . . Pappas was terminated. . . .").  Defendants have not introduced any affirmative evidence that Pappas was, in fact, terminated.

enforcement position.  *Id.* ¶ 29.[10]  Plaintiff received a restraining order against Pappas; first a temporary restraining order, and eventually a final restraining order on August 2, 2018.  *See* Compl. ¶ 13.  EPD arrested Pappas on February 17, 2019 after a neighbor reported that Pappas drove his vehicle past Plaintiff's home.  Defs. Facts ¶ 30.

### D. Other Incidents Involving Pappas

Prior to the subject incident leading to Pappas's arrest, personal issues involving Pappas were called to Chief Bryan's attention at least twice.[11]  Defs. Facts ¶ 37.  Each time, Chief Bryan did not return him to regular duty until an evaluating psychologist found him fit for duty.  *Id.*

One such incident was April 16, 2008.  In that incident, Pappas's first wife ("S.P."), filed a domestic violence complaint about Pappas to EPD.  Pl. Supp Facts ¶ 3.  S.P. alleged that Pappas threatened and pointed a gun at her.  *Id.*

On May 5, 2008, S.P. also alleged that Pappas slashed her tires after S.P. had obtained a temporary restraining order ("TRO").  *Id.* ¶ 4.  EPD did not investigate the incident.  *Id.*

On June 13, 2008, Pappas and another EPD officer filed a use of force report during an incident involving a mentally unstable individual.  *Id.* ¶ 5.  EPD IA Lieutenant Severino filed a report to Chief Bryan on November 12, 2008, sustaining the charges that Pappas and the other officer used excessive force.  *Id.*

On December 29, 2008, Chief Bryan issued a letter to Pappas and the other officer advising them that no formal department charges would be brought as a result of their actions on June 13, 2008.  *Id.* ¶ 6.  Thereafter, a different IA officer, Lieutenant Formica, was assigned to investigate,

---

[10] As of the filing of Defendants' summary judgment motion, it is unclear whether Pappas was sentenced.

[11] Plaintiff argues that because IA documents were purged, "there is no way to prove whether there were other evaluations."  Pl. Resp. Facts ¶ 37.  Defendants acknowledge that the records were "unlawfully purged."  *See* Pl. Supp. Facts ¶ 20; Defs. Resp. Facts ¶ 20.

and exonerated Pappas.  *Id.* ¶ 7.  Chief Bryan characterized Lieutenant Formica's investigation as "negligent" and asked for a more thorough investigation.  *Id.* ¶ 8.

From April 26, 2009 to June 30, 2013, at least eight complaints were filed against Pappas; all were not sustained or substantiated.  *Id.* ¶ 9.  One was a September 20, 2011 domestic violence/harassment complaint by S.P. in Wall Township.  *Id.* ¶ 10.

Additionally, in 2016, after Pappas ran a Criminal Justice Information Search ("CJIS") on a New Jersey State Trooper's license plate and driver's license, Pappas was charged with unlawful CJIS access and stalking.  *Id.* ¶11; Defs. Resp. Facts ¶ 11.[12]  Other EPD officers were fired for running a single, unauthorized search; Pappas was not.  Pl. Supp. Facts ¶ 11.

On June 27, 2017, Pappas kicked in Plaintiff's door.  Pl. Supp. Facts ¶ 13.  After Plaintiff's friend, who was on the phone with Plaintiff at the time, called police, EPD responded.  *Id.*  Neither EPD nor Plaintiff pursued any charges.  *Id.*; Defs. Resp. Facts ¶ 13.  EPD records show that Pappas was stalking Plaintiff at her home and job between May 10, 2017 through March 19, 2018, when he was arrested after slashing Plaintiff's tire.  Pl. Supp. Facts ¶ 22.

### E.  This Action and Motion

Plaintiff originally filed this action in New Jersey Superior Court, Middlesex County on March 17, 2020.  *See* D.E. 1 at 8 ("Complaint").  Defendants timely removed the action to this Court.  *Id.*

The Court[13] previously permitted substitute service by publication as to Pappas.  D.E. 24. After Plaintiff completed service and Pappas failed to answer, Plaintiff applied for, and was granted, a Clerk's entry of default.  D.E.s 25-26.

---

[12] Defendants' response to Plaintiff's Supplemental Statement of Material Facts.  D.E. 96 at 8.
[13] Magistrate Judge Wettre.

Plaintiff's Complaint, D.E. 1 at 8 ("Compl."), alleges various claims.  Counts One through Five allege state common law tort claims primarily against Pappas, but also briefly allege vicarious liability against Bryan and Edison:

1. Assault by stalking, Compl. ¶¶ 31-38;
2. Intentional Infliction of Emotional Distress ("IIED"), *id.* ¶¶ 39-44;
3. Trespass & Damage to Real Property, *id.* ¶¶ 45-51;
4. Invasion of Privacy, *id.* ¶¶ 52-56; and
5. Trespass to Personal Property, *id.* ¶¶ 57-62.

Counts Six through Eight are alleged against Edison and Chief Bryan:

6. Supervisory Liability, 42 U.S.C. § 1983, *id.* ¶¶ 63-66;
7. Negligent Hiring and Retention, *id.* ¶¶ 67-69; and
8. Negligent Supervision, *id.* ¶¶ 70-73.

And finally, Count Nine alleges a *Monell* claim against Edison only for "unconstitutional official policy" pursuant to 42 U.S.C. § 1983.

After the completion of discovery, Defendants moved for summary judgment.  *See* D.E. 94-18 ("Mot.").  Plaintiff opposes.  D.E. 95 ("Opp'n").  Defendants reply.  D.E. 96 ("Reply").

## II.    LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145–46 (3d Cir. 2004).  A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the initial burden of showing the basis for its motion and that there is no genuine dispute of material fact.  *See Celotex Corp.*, 477 U.S. at 323.  If the moving party

adequately supports its motion by citing to specific materials in the record, *see* Fed. R. Civ. P. 56(c)(1)(A), then the burden shifts to the nonmoving party to "go beyond the pleadings" and designate specific facts on the record that demonstrate a genuine dispute for trial exists. *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). If material facts remain disputed but the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case[,]" then the dispute is not genuine and summary judgment is appropriate. *Id.* at 322.

In reviewing a summary judgment motion, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. In doing so, a court "may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

## III.    ANALYSIS

### A.    State Law Claims

      *1.   Plaintiff's state law intentional tort claims, Counts One through Five, will be dismissed pursuant to the New Jersey Tort Claims Act ("NJTCA")*

Defendants argue that the NJTCA immunizes them against Plaintiff's state law intentional tort claims. The NJTCA provides that "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." N.J. Stat. Ann. § 59:2–2.

However, an exception exists for public entities where the act or omission of the employee constitutes "a crime, actual fraud, actual malice, or willful misconduct." N.J. Stat. Ann. § 59:2–10; *see, e.g.*, *Sims v. Tropicana Entm't, Inc.*, No. 13–1981, 2016 WL 4801431, at *3 (D.N.J. Sept. 9, 2016) ("Assault and battery are torts that require a showing of intentional or willful misconduct. Therefore, the [municipality] is immune from liability for the assault and battery claims.") (citing *Merman v. City of Camden*, 824 F. Supp. 2d 581, 597 (D.N.J. 2010)). As such, "with respect to such intentional torts, the theory of *respondeat superior* does not apply." *Hoag v. Brown*, 397 N.J. Super. 34, 53–54 (App. Div. 2007).

Here, as Defendants argue, the allegations underlying Counts One through Five allege Pappas's intentional, willful, and/or malicious conduct. *See* Opp'n at 13-14 (citing Compl. ¶¶ 32, 41, 49, 55, 59). In opposition, Plaintiff argues that Defendants should be liable because they were "negligent in their failure to enact or follow policies, negligent training and retention of Pappas, and negligent supervision of . . . Pappas." Opp'n at 28.

The negligence claims are addressed below. But because Plaintiff does not contest, and thus concedes, that she alleges intentional conduct by Pappas, *respondeat superior* liability for that conduct is unavailable. *See Gattas v. City of Jersey City*, No. CIV.A. 07-4242, 2010 WL 892187, at *11 (D.N.J. Mar. 5, 2010) (dismissing *respondeat superior* claim against city, police, and supervisors relating to officer's intentional torts).

Accordingly, Counts One through Five will be **DISMISSED** as against Edison and Chief Bryan.

> ### 2. *Plaintiff's state negligent retention and supervision claims (Counts 7 and 8) will not be dismissed*

"Unlike *respondeat superior*, negligent hiring, supervision, and training are not forms of vicarious liability and are based on the direct fault of an employer." *G.A.-H. v. K.G.G.*, 238 N.J.

401, 415–16 (2019) (citing *Hoag v. Brown*, 397 N.J. Super. 34, 54 (App. Div. 2007) ("[A] claim based on negligent hiring or negligent supervision is separate from a claim based on *respondeat superior*."). Thus, unlike *respondeat superior* liability, negligent hiring covers acts committed outside the scope of employment. *Hoag*, 397 N.J. Super. at 54.

To be found liable for negligent hiring, the plaintiff must show: (1) that the employer "knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons" and (2) "that, through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury." *Di Cosala v. Kay*, 91 N.J. 159, 173 (1982). Negligent supervision or training claims have the same standard, but framed in terms of supervision or training. *See id.* Thus, plaintiff must prove that (1) an employer knew or had reason to know that the failure to supervise, train, or fire an employee in a certain way would create a risk of harm and (2) that risk of harm materializes and causes a plaintiff's damages.

As an initial matter, Plaintiff does not point to any evidence in the record suggesting that Defendants' hiring of Pappas was negligent. Accordingly, any negligent hiring claim will be dismissed.

As to negligent retention and supervision, however, a reasonable jury could find both knowledge and harm. As to knowledge, a reasonable jury could find that Chief Bryan not only knew of Pappas's prior domestic violence incidents, but also that Plaintiff specifically asked Chief Bryan to keep Pappas away from her.[14] As to the harm, a reasonable jury could also find that

---

[14] A jury could also find that improperly purged IA records contained yet more incidents regarding Pappas.

Defendants' failure to fire or more closely supervise Pappas—even limiting that supervision to Pappas's time on duty—permitted Pappas to use EPD resources and personnel to stalk Plaintiff and eventually follow her and slash her tires. *See, e.g., Simonson v. Formisano*, No. 2:20-CV-20480, 2021 WL 2221328, at *5 (D.N.J. June 1, 2021) (finding plaintiff stated claim for negligent retention and supervision where police department retained plaintiff despite awareness of officer's "deteriorating mental state" and allowed him to retain service weapon ultimately used by officer to shoot plaintiff and second victim); *Denis v. City of Newark*, 307 N.J. Super. 304, 313 (App. Div. 1998) (finding that department knew or should have known of officer's dangerous propensities based on three violent incidents in personnel file, two of which predated subject assault).

To the extent that Defendants argue, in reply, that they could not have been negligent because Pappas was cleared on multiple occasions to return to policy duty, Reply at 5, or that other supervising EPD officers never reported problems with Pappas's performance, those are issues of fact for the jury to weigh against Pappas's confirmed history and Chief Bryan's knowledge. Accordingly, Plaintiff's Counts Seven and Eight will not be dismissed.

**B.    The Two-Year Statute of Limitations Bars Claims Prior to March 17, 2018**

Defendants argue that the two-year personal injury statute of limitations should bar any claims accruing prior to March 17, 2018, two years before Plaintiff filed the Complaint in state court. Mot. at 16. Plaintiff argues that the discovery rule delays the end of the limitations period until the date that Plaintiff "discovered or should have reasonably discovered that she had been injured." Opp'n at 29. Plaintiff also argues that the continuing violation/tort doctrine likewise delays the end of the limitations period through at least March 19, 2019, when Pappas violated the restraining order Plaintiff obtained after the tire-slashing incident approximately a year prior. *See id.*

Because Pappas has not appeared, and because Plaintiff has not moved for default judgment against him, the Court does not address the statute of limitations pertaining to any claims against Pappas. Rather, the Court addresses only the allegations against the moving Defendants, dismissed above: the § 1983 and negligence claims, both of which have two-year statute of limitations. A negligence cause of action accrues when the negligence proximately results in injury. *Rescigno v. Picinich*, 151 N.J. Super. 587, 596 (Law. Div. 1977). Similarly, a § 1983 claim begins to accrue upon knowledge that an injury has occurred, though a plaintiff need not have "notice of every fact which must eventually be proved in support of a claim." *Thomas v. Bushkill Twp.*, No. CIV.A. 11-7578, 2014 WL 958799, at *5 (E.D. Pa. Mar. 12, 2014).

Here, the record indicates the beginnings of a negligence claim sometime in 2016, when Plaintiff informed Chief Bryan that she wanted Pappas to stay away from her, and by which time Chief Bryan had been aware of Pappas's prior conduct—including a prior tire-slashing incident involving Pappas's ex-wife. *See* Defs. Facts ¶¶ 7, 8; Pl. Dep. at 89:12-90:19 (Plaintiff had a conversation about Pappas with Chief Bryan at Bryan's office before Pappas lived with Plaintiff, a nine-month period ending July 1, 2017). However, Plaintiff references numerous incidents resulting in some form of injury: Pappas's unlawful entry when he kicked Plaintiff's door down on June 27, 2017, other incidents "between 2014 and 2018, and the tire-slashing incident on March 19, 2018. *See* Opp'n at 30.

Plaintiff argues, and Defendants acknowledge, that Plaintiff did not recognize any injury stemming from Pappas's stalking until the tire-slashing incident. *See id.* at 31; Reply at 14 ("[H]ow was plaintiff 'injured' . . . by virtue of Pappas' stalking, which she did not know was occurring, until he utilized that personal equipment to locate her vehicle in New Brunswick on the night of March 17, 2018 to facilitate slashing her tire?"). Accordingly, the statute of limitations bars any

negligence claims prior to March 17, 2018, but does not include the March 19, 2018 tire-slashing incident. *See Norwood v. Michigan Dep't of Corr.*, 67 F. App'x 286, 288 (6th Cir. 2003) (affirming *sua sponte* dismissal of threats against plaintiff made beyond the three-year statute of limitations).

**C.    The § 1983 Claims (Counts Six and Nine) Will Be Dismissed Because Pappas Was Not Acting Under "Color of Law"**

A plaintiff may have a cause of action for constitutional rights violations under 42 U.S.C. § 1983, which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

A § 1983 claim requires the violation of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed or caused by a person acting under color of state law. *See Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011); *see also West v. Atkins*, 487 U.S. 42, 48 (1988). Here, Defendants argue that Plaintiff cannot sustain her § 1983 claims because Pappas was not acting under color of state law. Mot. at 24. Plaintiff counters that Pappas stalked Plaintiff for over seven months while on duty as an EPD officer in a marked EPD patrol car. *See* Opp'n at 14.

"Although 'state employment is generally sufficient to render the defendant a state actor,' not all torts committed by state employees constitute state action, even if committed while on duty. For instance, a state employee who pursues purely private motives and whose interaction with the victim is unconnected with his execution of official duties does not act under color of law."

13

*Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 24 (3d Cir. 1997) (quoting *West v. Atkins,* 487 U.S. 42, 50 (1988)).  "[F]or the tortfeasor to be acting under color of state law, his act must entail 'misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1150 (3d Cir. 1995) (quoting *United States v. Classic,* 313 U.S. 299, 326 (1941)).  "[A]n otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state."  *Id.*

"[U]nder color of law means under 'pretense' of law.  Thus, acts of officers in the ambit of their personal pursuits are plainly excluded.  Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it."  *Screws v. United States,* 325 U.S. 91, 111 1495 (1945) (plurality opinion).  Thus, "off-duty police officers who flash a badge or otherwise purport to exercise official authority generally act under color of law."  *Id.* (citing *Rivera v. La Porte,* 896 F.2d 691, 696 (2d Cir. 1990) (finding state action existed because offender identified himself as peace officer, arrested plaintiff and used police car)).

"But even 'acts committed by a police officer . . . while on duty and in uniform are not under color of state law unless they are in some way 'related to the performance of police duties.'" *Id.* (quoting *Briscoe v. LaHue,* 663 F.2d 713, 721 n. 4. (7th Cir.1981) (cleaned up)).  "If a person's actions 'were not committed in the performance of any actual or pretended duty,' the actions were not committed under color of law."  *Id.* (quoting *Bonsignore v. City of New York,* 683 F.2d 635, 639 (2d Cir. 1982)).  Phrased differently, the officer's "authority must enable the officer to do what he did."  *Jackson-Gilmore v. Dixon*, No. 04-03759, 2005 WL 3110991, at *10 (E.D. Pa. Nov. 18, 2005); *see Classic,* 313 U.S. at 326 (action pursued under color of law is "the misuse of power ...

14

made possible *only because* the wrongdoer is clothed with the authority of state law") (emphasis added).

"Thus, a police officer's purely private acts," even while on duty, "which are not furthered by any actual or purported state authority are not acts under color of state law." *Barna v. City of Perth Amboy*, 42 F.3d 809, 816-17 (3d Cir. 1994) (*See Delcambre v. Delcambre,* 635 F.2d 407, 408 (5th Cir. 1981) (holding that alleged assault by on-duty police chief at police station did not occur under color of state law because altercation with the plaintiff, defendant's sister-in-law, arose out of a personal dispute and defendant neither arrested nor threatened to arrest the plaintiff); *see also D.T. v. Independent School Dist. No. 16,* 894 F.2d 1176 (10th Cir. 1990) (finding sexual molestation of students by public school teacher/coach that occurred on an excursion unconnected to school activities during school vacation period when teacher was not employed by the school district did not occur under color of state law), *cert. denied,* 498 U.S. 879 (1990).

To determine if an officer relied upon "cloak of the state's authority" to commit the alleged acts, courts ask whether the officer's actions are consistent with actions generally taken by a police officer. *See Griffin v. Maryland,* 378 U.S., 130 (1964); *Barna,* 42 F.3d at 816; *Nonnemaker v. Ransom*, No. CIV. 99-912, 1999 WL 387084, at *3 (E.D. Pa. May 26, 1999). Courts examine the officer's acts, in context, to determine whether an officer was acting in his official capacity and whether the officer invoked police authority. *Barna,* 42 F.3d at 818. Manifestations of police authority may include flashing a police badge, identifying oneself as a police officer, indicating that the officer is on official police business, attempting to make an arrest or placing an individual under arrest, or intervening in a dispute involving others pursuant to a duty imposed by police department regulations. *Id.* at 816. Thus, more must be present than an on-duty police officer, or a uniform and police car. *See Jackson-Gilmore*, 2005 WL 3110991, at *11 ("In addition to arriving

in a police car and being dressed in his police uniform, [officer] allegedly made several statements to [plaintiff] indicating [officer] was acting with police authority" and admitted at deposition that he was at the scene to investigate complaint).

Plaintiff cannot point to any facts in the record from which a reasonable jury could infer a relationship between Pappas's misconduct and his state-appointed power, authority, or duties.  For example, first, Plaintiff speculates, without citation to the record or any further evidence, that Pappas was able to drive on Plaintiff's street without neighbor complaints.  *See* Opp'n at 15.  Second, Plaintiff argues—again without citation—that Pappas "made illegal CJIS inquiries" using police authority, but does not tie those inquiries to Plaintiff.  *Id.*  Third, Plaintiff argues that Pappas requested that a fellow officer drive by Plaintiff's house, but there is no indication that Pappas had the authority to give that officer orders.  *Id.* at 16; *see Rouse v. City of Milwaukee*, 921 F. Supp. 583, 588 (E.D. Wis. 1996) (no relationship between misconduct and state power where defendant had the same rank and no authority to give plaintiffs orders).

Finally, Plaintiff argues that Pappas was only able to find Plaintiff at her boyfriend's home and slash her tires because of the state authority afforded by his EPD car and uniform.  Opp'n at 15-16.  But in fact, Plaintiff acknowledges that "Pappas used a GPS tracking device to stalk and track Plaintiff for several months prior to the tire-slashing and illegal use of his police computer." Pl. Resp. Facts ¶ 32.  And it is undisputed that Pappas purchased the GPS device himself; EPD did not supply it.  Defs. Facts ¶ 39; Pl. Resp. Facts ¶ 39.

Accordingly, Defendants have adequately demonstrated, and Plaintiff has not rebutted, that no triable issue of fact remains with respect to whether Pappas was acting under color of state law when he committed the alleged torts.  *Cf. Furgason v. Valdez*, No. CV 02-906, 2003 WL 27384949, at *5 (D.N.M. Sept. 9, 2003) (denying summary judgment where defendant "abused . .

. the power of his police authority to obtain Plaintiff's vehicle registration information in order to find out her identity, without any legitimate law enforcement need to do so," and used that information to follow and stalk her); *Doe v. Whitebread*, No. CV 3:15-1165, 2017 WL 590272, at *3 (M.D. Pa. Feb. 14, 2017) (finding that plaintiff adequately alleged that officer acted under color of state law officer allegedly "used his authority . . . to enter the plaintiff's apartment twice during the early morning hours while most citizens are asleep," made threats of arrest based on his confiscation of suspected marijuana, attempting to scare the plaintiff into submission, and sexually assaulted plaintiff). The Court will therefore **DISMISS** the § 1983 claims (Counts Six and Nine).[15]

---

[15] Based on this dismissal, the Court need not address Defendants' other argument regarding Count Six, that Plaintiff cannot establish supervisory liability against Chief Bryan, or that Plaintiff cannot establish *Monell* liability because the evidence is limited to prior, unsustained IA complaints against Pappas and "personal" issues that do not establish a custom within EPD. Mot. at 29, 35-36. In opposition, Plaintiff alleges broad corruption by EPD under Chief Bryan's term as Chief of Police and, before that, as IA commander, which served to selectively protect Pappas. Opp'n at 16-17. That conduct, Plaintiff alleges, "contributed to . . . Pappas's violent conduct toward Plaintiff." *Id.* at 17.

Although municipal and supervisory liability may be based on a deficient training policy or a failure to supervise, *see Freedman v. City of Allentown,* 853 F.2d 1111, 1117 (3d Cir.1988); *Chinchello v. Fenton,* 805 F.2d 126, 133 (3d Cir.1986), plaintiff must show, at least, "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." *Id.*

Here, Defendants' attempt to minimize EPD behavior is unpersuasive. A reasonable jury might note Chief Bryan's knowledge of Pappas's prior violent behavior, including toward his ex-wife, and likewise note the lack of additional supervision or punishment. They might likewise examine instances in which other officers were punished for misbehavior where Pappas was not, including for unlawfully accessing the CJIS database, failure to remove his ex-wife from his insurance, and improperly working an off-duty job. *See* Opp'n at 18. From this evidence, a jury could reasonably infer a culture within EPD, flowing from Chief Bryan, of impunity for Pappas leading to or facilitating his behavior toward Plaintiff. However, absent any action by Pappas undertaken "under color of law," Count Six will be dismissed.

**IV.     CONCLUSION**

For the reasons above, Defendants' summary judgment motion is **GRANTED *in part*** to the following extent: Plaintiff's Counts One through Five will be **DISMISSED** as against Chief Bryan and Edison; Plaintiff's Counts Six and Nine will be **DISMISSED**; and Plaintiff's Counts Seven and Eight will not be dismissed.  An appropriate order follows.

Dated: June 5, 2024

Evelyn Padin, U.S.D.J.